UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| DAVID A. HUGHES,<br><br>        Plaintiff,<br><br>        v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of the Social<br>Security Administration,<br><br>        Defendant. | Case No. EDCV 05-00658 AJW<br><br>MEMORANDUM OF DECISION |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the rather lengthy procedural history of this case, which is summarized in the Joint Stipulation. [See JS 2-3]. Plaintiff filed an application for disability insurance benefits on August 17, 2000 alleging that he had been disabled since April 10, 2000 due to diabetes mellitus, peripheral neuropathy of the upper and lower extremities, hypertension, lumbar disc syndrome, chondromalacia patella (softening of the cartilage) and instability of both knees, and left ankle problems. [Administrative Record ("AR") 126].

1  Following an adverse hearing decision and the filing of an action for review, a stipulated
2  judgment for voluntary remand was filed on June 11, 2004. [JS 2]. On remand, plaintiff's
3  application for benefits was finally denied in a written hearing decision by Administrative Law
4  Judge John W. Belcher (the "ALJ") dated April 22, 2005. [JS 3; AR 1290-1303]. He found that
5  plaintiff had severe degenerative disease of the spine with facet disease and diabetic
6  gastroparesis,[1] and that plaintiff had degenerative joint disease in the knees, insulin dependent
7  diabetes mellitus, and depression that were not severe prior to plaintiff's date last insured of
8  December 31, 2001. [AR 1303]. The ALJ concluded that plaintiff was not disabled before his
9  date last insured because he retained the residual functional capacity ("RFC") for a narrow
10 range of light work, and plaintiff's RFC did not preclude performance of his past relevant work
11 as a patient admission coordinator. [AR 1303].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or if it is based on the application of incorrect legal standards. Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is more than a mere scintilla but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Thomas, 278 F.3d at 954. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)); Thomas, 278 F.3d at 954. The court is required to review the record as a whole, and to consider evidence detracting from the decision as well as evidence supporting the decision. Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Commissioner of

---

[1] Diabetic gastroparesis is a diabetic neuropathy affecting the gastrointestinal system and causing delayed emptying of the bowels. See Stedman's Medical Dictionary gastroparesis, neuropathy (27th ed. 2000).

1  Social Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

2  **Discussion**

3  **Medical opinion evidence**

4  Plaintiff contends that the ALJ did not properly evaluate the opinions of his treating and examining physicians.

6  A treating physician's opinion is not binding on the Commissioner with respect to the existence of an impairment or the ultimate issue of disability. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). Where, however, a treating physician's medical opinion as to the nature and severity of an individual's impairment is well-supported and not inconsistent with other substantial evidence in the record, that opinion is entitled to controlling weight. Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001); Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); see 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *1-*2. Even when not entitled to controlling weight, "treating source medical opinions are still entitled to deference and must be weighed" in light of (1) the length of the treatment relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the supportability of diagnosis; (5) consistency with other evidence in the record; and (6) area of specialization. Edlund, 253 F.3d at 1157 & n.6 (quoting SSR 96-2p and citing 20 C.F.R. § 404.1527); Holohan, 246 F.3d at 1202.

19  Where the opinion of a treating or examining physician is uncontroverted, the ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting it. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Commissioner of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

25  The ALJ credited the opinions of treating physician James Shook, M.D., and non-examining medical experts Dr. Nafoosi and Minh Vu, M.D. [AR 1299-1301]. On March 21, 2003, after plaintiff's date last insured, Dr. Shook opined that due to "complex spinal condition superimposed on endocrine disturbance," plaintiff was "presently incapable" of "any form of

3

gainful employment and will be at this work status for at least 18 months." [AR 1157]. The ALJ found Dr. Shook's opinion to be "consistent with the medical evidence" and gave his opinion "great weight." [AR 1300].

During the November 20, 2004 hearing, Dr. Vu testified that plaintiff's impairments did not meet or equal any listing. [AR 1621]. He also testified that plaintiff could perform light work with some postural limitations. [AR 1621]. The ALJ deemed Dr. Vu's opinion "highly probative" and gave it "great weight," saying it was consistent with the record and the objective findings. [AR 1301].

During the February 17, 2005 hearing, Dr. Nafoosi, the medical expert, testified that plaintiff had chronic osteoarthritis in the cervical, thoracic, and lumbar spine and the left shoulder; insulin dependent diabetes since his alleged onset date, with peripheral neuropathy shown since April 2003; hypertension, without evidence of end organ damage; healed duodenal ulcer; and a depressive disorder. [AR 1661-62]. Dr. Nafoosi opined that plaintiff's impairments did not meet or equal a listed impairment prior to the expiration of plaintiff's insured status on December 31, 2001, but that they equaled section 1.04A of the Listing of Impairments in duration and severity as of September 2002, when plaintiff sustained an eight-foot fall which required a two-month hospitalization and aggravated his musculoskeletal complaints. [AR 1662]. The ALJ gave Dr. Nafoosi's opinion "great weight" because it was "consistent with the medical evidence" and with Dr. Shook's opinion. [AR 1301].

The ALJ did not acknowledge, much less reconcile, discrepancies between the three medical opinions he deemed worthy of "great weight" and "consistent with the medical evidence." The ALJ said he gave "great weight" to Dr. Nafoosi's opinion, in particular his testimony that plaintiff's impairments equaled listing section 1.04A as of September 2002. In the body of his decision, the ALJ also indicated that plaintiff's condition equaled that listing as of September 2002, but not before. [AR 1300-01]. Nonetheless, the ALJ also credited the opinion of Dr. Vu, who testified in November 2004 that plaintiff's impairments did not meet or equal a listed impairment. The ALJ said he gave "great weight" to Dr. Shook's March 2003 assessment that plaintiff was disabled and would remain so for 18 months, but he also gave

4

"great weight" to Dr. Nafoosi's testimony that plaintiff's impairments became disabling under the listing as of September 2002 *and* Dr. Vu's opinion that plaintiff at all times remained capable of performing a range of light work.

The ALJ ultimately concluded that "except for a brief period of recovery from his injuries in August 2000 and September 2002, the claimant remains capable of performing a narrow range of light work ...." [AR 1302]. That conclusion is consistent with Dr. Vu's testimony, but it is inconsistent with Dr. Shook's treating source opinion in March 2003 that plaintiff was disabled for a period of 18 months. That conclusion also is inconsistent with Dr. Nafoosi's opinion that plaintiff's condition equaled the listing (making him presumptively disabled) in September 2002. The ALJ did not explain how he could give these physicians' opinions "great weight" yet utterly disregard their conclusions about the fact and timing of plaintiff's disability.[2]

These errors might be considered harmless because the unresolved inconsistencies between these opinions relate to the period after the expiration of plaintiff's disability insured status.[3] The ALJ, however, did not limit his consideration of the evidence or his findings to the period before plaintiff's date last insured. Instead, he found that plaintiff was not under a disability at any time through the date of his decision. The ALJ also used his erroneous reading of these doctors' reports to support his adverse credibility finding. [See AR 1301-02]. Therefore, these errors are germane to his ultimate conclusions.

In addition, the ALJ did not adequately consider or explain aspects of Dr. Shook's and Dr. Nafoosi's opinions that undermined his conclusions about the severity of plaintiff's

---

[2] It should be noted that the ALJ was confronted with more than 1,000 pages of detailed medical records and diligently attempted to summarize and analyze the medical evidence. The size of the record, coupled with the number of plaintiff's impairments, their progressive nature, and the inherent difficulty of determining the onset of disability caused by a combination of multiple, non-traumatic impairments makes the evaluation of the evidence in this case especially challenging.

[3] It appears that plaintiff was not eligible for, and did not apply for, supplemental security income benefits. [See AR 1589, 1606].

5

impairments before his date last insured. For example, the ALJ said he credited Dr. Shook's March 2003 opinion that plaintiff was disabled. Plaintiff was first referred to Dr. Shook, an orthopedist, in January 2003. [AR 1139, 1144]. At that time, Dr. Shook recommended further testing (a bone scan with spectrum study of the sacrum and a CT scan the lumbar spine), a pain clinic evaluation, and then a return visit. [AR 1139]. On this return visit, in March 2003, Dr. Shook reviewed these records and opined that plaintiff was disabled. Since Dr. Shook did not undertake to evaluate plaintiff retrospectively, his opinion does not support the inference that plaintiff was *not* disabled *prior to* March 2003, but that appears to be the inference drawn by the ALJ. (Since the ALJ ultimately rejected Dr. Shook's opinion and found plaintiff not disabled at any time through April 22, 2005, there is no other reason for the ALJ to give Dr. Shook's opinion "great weight," and yet cite it in support of his non-disability finding.)

If any inference is warranted from Dr. Shook's March 2003 report, it is that plaintiff's disability probably began well before that date. In his narrative assessment, Dr. Shook described plaintiff's disabling impairments as "longstanding," "intractable," and "chronic." [AR 1157]. He noted that plaintiff had "[l]ongstanding L5-S1 spondylolisthesis with back and leg pain," fracture of L5 right pedicle, "probable active L5 radiculopathy with intractable leg pain," "[l]ongstanding diabetes mellitus with peripheral neuropathy," and "chronic [gastrointestinal] dysfunction secondary to diabetes complicating pain management regimen due to [gastrointestinal] intolerance to meds secondary to diabetes." [AR 1157]. As a Veteran's Administration ("VA") treating physician, Dr. Shook undoubtedly had access to plaintiff's VA medical records and possibly his military medical records as well, where plaintiff's long and complicated history of type I diabetes, orthopedic problems, and other impairments was well-documented. [See AR 16-20, 290-378, 380-420, 430-1093, 1107-1117, 1133-1289, 1294-1298]. Dr. Shook also might have been aware that plaintiff had been found totally disabled and unemployable by the VA as of March 1999 and was awarded VA disability benefits due to his combined impairments. [See AR 1298]. Because Dr. Shook's opinion is ambiguous at best regarding the date of onset of plaintiff's disability and lends little or no support the conclusion that plaintiff was not disabled before his date last insured, the ALJ's reliance on that opinion

to deny benefits was misplaced.

The ALJ also asserted that he gave Dr. Nafoosi's opinion great weight, but he did not adequately account for some portions of Dr. Nafoosi's testimony. During the February 2005 hearing, the ALJ asked plaintiff's counsel if he had located documentation in the record of episodes of hypoglycemia, specifically episodes with blood sugar levels below 60. Counsel said that he had submitted those citations in his brief showing self-reported low blood sugar levels and test results confirming low blood sugar levels. [AR 1671]. The ALJ then asked Dr. Nafoosi whether he could comment, based on the medical records, on how often he would expect plaintiff to have hypoglycemic episodes, and what kind of unscheduled breaks would be necessary if those episodes occurred. Dr. Nafoosi said his response "depends on so many variables" such as diet and activity, but that his "impression" from reading the record was that plaintiff had hypoglycemic episodes 1 to 3 times a week. [AR 1672]. Dr. Nafoosi said those episodes were not severe enough to require medical intervention and did not result in loss of consciousness, but they nonetheless would affect plaintiff's attention and concentration and would require a break from work. [AR 1666-67, 1672]. Dr. Nafoosi estimated that if plaintiff did have a hypoglycemic episode, he probably would require a 15- to 30-minute unscheduled break. [AR 1672]. Plaintiff's counsel then asked Dr. Nafoosi whether, if plaintiff was having these episodes "with his current regimen, would an increase in activity tend to increase the frequency of the hypoglycemic spells? I mean is that generally the case?" [AR 1672]. Dr. Nafoosi replied, "Yes, yes, yes." [AR 1672]. The vocational expert testified that the need to have unscheduled breaks one to three times a week for 15 to 30 minutes was incompatible with the demands of full-time employment. [AR 1675-1676].

In his hearing decision, the ALJ concluded that "despite plaintiff's fluctuating blood sugars, the claimant's diabetes has been stable and under control on or before his date last insured in December 2001. Furthermore, a progress note dated June 29, 2004 noted that plaintiff's hemoglobin A1C levels had been consistently near normal."[AR 1301]. The ALJ also said that plaintiff's doctor saw "no need to change plaintiff's treatment despite blood sugar fluctuations." [AR 1301].

7

Plaintiff, however, points to evidence in the record of numerous "volatile/low blood sugars," including six instances documented before expiration of his insured status. [See AR 224, 317, 388, 392-393, 406, 1079-80, 1133, 1189, 1227, 1232, 1237, 1244, 1252, 1360, 1363-64, 1366-67]. Indeed, it appears that it was precisely because plaintiff attempted to keep his blood sugar level under tight control (and thereby avoid diabetic complications) that he suffered hypoglycemic episodes. He also testified that his diabetes was "brittle," meaning his blood sugar levels fluctuated and were difficult to control, with marked highs and lows. [See AR 392-393, 1570, 1581-84, 1665-69; see also AR 1366-67 (diagnosis of "brittle" type I diabetes)]. In the June 2004 treatment report cited by the ALJ, plaintiff's treating endocrinologist wrote that plaintiff did an "outstanding job" of caring for himself and was needlessly worried about "some high sugars" in view of the fact that his A1C has been "consistently near normal," and thus no change in his diabetes treatment was warranted. [AR 1362]. Notes from other VA physicians from the same few days, however, show that plaintiff was seen for hypogylcemic episodes, which he reported were happening about three times a week at that point. [AR 1360-1366]. Thus, even if those treating records show that plaintiff's high blood sugar levels were not a problem, they also are consistent Dr. Nafoosi's testimony that plaintiff had recurrent hypoglycemic episodes resulting in a need for unscheduled breaks. Because the ALJ found Dr. Nafoosi's testimony credible overall, he should either have credited that testimony or provided persuasive reasons for rejecting it.

The ALJ also rejected a November 2001 disability opinion provided by plaintiff's VA treating physician Ronald Griffin, M.D. [AR 422-429]. Dr. Griffin stated that plaintiff had been seen biweekly since February 1995. His diagnoses were (1) spondyloysis/spondylolisthesis grade II with radiculopathy, resistant to therapy; (2) type I diabetes with peripheral neuropathy, retinopathy, and impotence; (3) gastroparesis secondary to diabetes with weight loss of 25 pounds; (4) hypertension; (5) chondromalacia knees; (6) depression; (7) migraine headaches; (8) constipation (irritable bowel syndrome); (9) autonomic dysfunction; and (10) "c-spine" (referring to the cervical spine, without further explanation). [AR 422]. For each condition, Dr. Griffin specified positive clinical findings or test results. For example, he said that

spondylolisthesis was supported by positive MRI and EMG studies; chondromalacia, by x-rays and orthopedic evaluation; gastroparesis, by gastric emptying studies; and autonomic dysfunction, by hot flashes and sweating inappropriate to environment. [AR 422]. He also said there were "+ [positive] supportive tests for each condition," including CT studies, MRIs, endoscopy, blood tests, and others. [AR 423]. He listed plaintiff's symptoms for each condition, including low back pain radiating to the right foot and leg, bilateral knee pain, decreased sensation in the feet, hypogylcemic episodes "twice/[illegible]" spontaneous nausea and vomiting after meals, headaches, constipation, diarrhea, abdominal pain, spontaneous flushing and sweating, insomnia, fatigue, memory loss, anxiety, and depression due to his "multiple incapacitating illnesses." [AR 423]. He characterized plaintiff's pain overall as daily, constant, and severe (up to 9/10), requiring bed rest and change of position. He said that plaintiff had fatigue in the high moderate range (6/10). [AR 424]. Dr. Griffin indicated that plaintiff could sit, stand, or walk for less than an hour before needing to move around and could not sit, stand, or walk continuously in a work setting. [AR 424-425]. He opined that p laintiff had marked upper extremity limitations. [AR 425-426]. He listed more than 15 prescribed medications, and he noted that plaintiff also had been treated with physical therapy, left ankle surgery, a TENS unit for pain, back and knee braces, orthopedic shoes with inserts, an ankle brace, and a cane. [AR 426]. He noted that plaintiff's diabetes lowers resistance to, and increases the incidence of, colds, influenza, and infected cuts, and that plaintiff would take longer to recover from those ailments. [AR 428]. Dr. Griffin opined that plaintiff's symptoms likely would increase in a work setting, that plaintiff would need frequent unscheduled breaks and absences, and that he could not sustain full-time employment. [AR 426-427]. Finally, Dr. Griffin commented:

> Having seen this patient over the years and witnessed increasing signs and symptoms and complications of back pain and diabetes, knee and ankle pain, multiple meds, that he is truely [sic] severely impaired for sustained, competitive employment and fits classification of totally disabled for employment.

[AR 428].

9

A very similar assessment and disability opinion was given by examining physician Joseph Nassir, M.D. in December 2001. [AR 1095-1105]. The ALJ rejected that opinion as well.

The ALJ's reasons for rejecting Dr. Griffin's and Dr. Nassir's opinions are not supported by substantial evidence in the record as a whole. For example, the ALJ said that he found their conclusions not credible because plaintiff's pain symptoms were treated primarily with Tylenol and Motrin. This statement ignores the multiple prescription medications (listed by Dr. Griffin and documented elsewhere in the record) which plaintiff took to control a variety of impairments and symptoms before his date last insured. [See, e.g., AR 151, 388]. These medications include acetominophen 500 milligrams for pain; artificial tears for dry eyes; nasal inhalant (Becomethasone, Flunisolide) for sinus problems; Celebrex for pain; Cetrizine or Lotramine for allergies; Diphenhydramine for itching; Gabapentin for neuropathic pain; Ranitidine for stomach acid; Senna, Docusate, and psyllium for constipation; Metoclopramide, Prochlorperazine Maleate and Lansoprazole for nausea and vomiting; Capasicin .025% cream for joint pain; Lisinopril for hypertension; Etodolac for pain; Zolpidem for insomnia; hydrocodone for pain; and ibuprophen 800 milligrams for pain. [AR 151-155, 304, 314, 384, 388].

The ALJ also disagreed with these physicians' assessment of plaintiff's orthopedic impairments because progress notes from December 2001 and May 2002 showed that plaintiff could ambulate without difficulty and had a steady gait, and because loss of motor strength was not documented. [AR 1299-1300]. Elsewhere in the record, however, there are positive findings supporting plaintiff's orthopedic impairments and symptoms, such as abnormal MRI and x-ray findings [AR 278, 314, 413-417], and these findings were sufficient to prompt plaintiff's treating physicians to prescribe multiple treatment modalities for his back and joint pain and to recommend a surgical consultation. [See AR 291-420]. As plaintiff's long-time treating physician, Dr. Griffin's interpretation of the abnormal findings he cited to support his disability opinion is entitled to deference, as is his subjective judgment about the combined functional effects of plaintiff's multiple impairments and medications. Lester, 81 F.3d at 832-833 ("The Commissioner is required to give weight not only to the treating physician's clinical

findings and interpretation of test results, but also to his subjective judgments.... The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment."), Moreover, Dr. Griffin's opinion is very consistent with that of Dr. Nassir, whose opinion as an examining source is entitled to more weight than those of the non-examining medical experts. See 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) (explaining that the more consistent an opinion is with the record as a whole and the more support there is for that opinion, the more weight it will be given); see also Lester, 81 F.3d at 831-832 (explaining that examining source opinions generally are entitled to more weight than non-examining source opinions, and that similarity between doctors' opinions enhances their credibility).

While not conclusive, the VA's finding that plaintiff was disabled and unemployable provides an additional reason for giving Dr. Griffin's opinion controlling weight. See McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002) (holding that "although a VA disability rating does not necessarily compel the SSA to reach the same result, the ALJ must consider the VA's finding in reaching his decision," and must give great weight to a VA disability determination unless he gives "persuasive, specific, valid reasons" supported by the record for giving that determination less weight). The ALJ was unpersuaded by the VA's disability rating for essentially the same reasons he rejected the opinions of Drs. Griffin and Nassir. He also disregarded that rating because was based on "multiple conditions with multiple somatic complaints with only mild findings" which, when combined, exceeded a 100% disability rating. [AR 1298]. That a claimant's disability arises from the combined effect of multiple impairments, none of which may be disabling if considered singly, does not disqualify him form receiving social security disability benefits. In this case, the number and complexity of plaintiff's multiple impairments and medications are factors that weigh in favor of giving great weight to his VA disability rating and to the disability opinions of his treating and examining physicians.

For all of the foregoing reasons, the ALJ erred in rejecting the opinions of Drs. Griffin and Nassir in favor of the conflicting opinions of Drs. Shook, Vu, and Nafoosi.

## Conclusion

In general, the choice whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the discretion of the court. See Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.) (holding that the district court's decision whether to remand for further proceedings or payment of benefits is discretionary and is subject to review for abuse of discretion), cert. denied, 531 U.S. 1038 (2000). The Ninth Circuit has observed that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)).  A district court, however,

> should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman, 211 F.3d at 1178).

///

///

///

The ALJ erroneously rejected treating and examining opinions which predate plaintiff's date last insured. If credited, those opinions would require a finding of disability beginning on November 5, 2001 (the date of Dr. Griffin's treating disability opinion). Because the Commissioner already has had two opportunities to adjudicate this case, no useful purpose would be served by giving her another opportunity to do. Accordingly, the Commissioner's decision is reversed, and the case is remanded for an award of benefits consistent with this memorandum of decision.[4]

**IT IS SO ORDERED.**

DATED: August 22, 2006

                                                /s/
                                     ANDREW J. WISTRICH
                                     United States Magistrate Judge

---

[4] This disposition makes it unnecessary to consider plaintiff's remaining contentions.